IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JASON TODD,                          )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )          Case No. 2:20-cv-1006-RAH
                                     )                     [WO]
DAVID P. HICKS, JR.,                 )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Shortly after midnight on August 4, 2018, Tonya Anderson was fatally struck in a hit-and-run accident by Roger Glenn, a cousin of the chief of police of the Clanton Police Department, while walking along U.S. Highway 31 in Clanton, Alabama, following a night out at a local bar.  Officer David P. Hicks, Jr. of the Clanton Police Department recommended presenting Anderson's death to a grand jury in his final traffic homicide report.  While Glenn gave conflicting statements as to what happened and where, Hicks nevertheless recommended that Anderson's husband, Jason Todd, be found "solely responsible and fully accountable" for her "wrongful death" and that Glenn be cleared of all responsibility.  Hicks further factually represented that Todd intentionally threw Anderson's car keys into the

roadway after a dispute over her ability to drive home due to her intoxication, thereby causing her to walk into traffic and be struck by Glenn's vehicle.

A grand jury ultimately indicted Todd for criminal manslaughter based on the report and recommendation of Hicks.  The indictment was later quashed by a Chilton County circuit judge who, after hearing testimony, concluded that no reasonable grand jury would have found probable cause to find that Todd had committed a crime in connection with Anderson's death—especially after Hicks testified during the hearing that there was no direct evidence showing that Todd had thrown Anderson's keys.

Todd then filed this civil lawsuit, asserting claims under 42 U.S.C. § 1983 and Alabama state law.  He claims Hicks violated his rights under the Fourth Amendment to the United States Constitution, and he also brings an Alabama state law claim for malicious prosecution.[1]

Pending before the Court is Hicks's motion for summary judgment.  (Doc. 30.)  After reviewing the parties' submissions, the Court concludes that Hicks's motion is due to be denied in its entirety.

---

[1] In addition to suing Hicks, Todd sued Officer Cameron Bates and the City of Clanton, and he also asserted an outrage claim under Alabama law.  (Doc. 1.)  The Court dismissed Bates and the City as defendants and dismissed Todd's outrage claim on April 23, 2021.  (Doc. 21.)

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over Todd's federal claim under 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claim under 28 U.S.C. § 1367(a).  Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to [its] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The legal elements of a claim determine which facts are material and which are not material.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A fact is not material if a dispute over that fact would not affect the outcome of the case under the governing law.  *Id.*

A court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the evidence in the nonmovant's favor.  *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242–43 (11th Cir. 2001).  The nonmovant must produce sufficient evidence to enable a jury to rule in

his favor; a mere scintilla of evidence in support of a position is insufficient. *Id.* at 1243.

## IV.  BACKGROUND

The facts, stated in the light most favorable to Todd, the nonmovant, are as follows:

### A. The Night of the Accident

From approximately 8:30 p.m. to midnight on August 3, 2018, Todd performed with his band, Kountry Knights, at Friend's Bar and Steakhouse on U.S. Highway 31 in Clanton, Alabama.  (Doc. 34-1 at 2.)  Anderson, Steffani Fitts Deerman (Todd's mother), and Nicole Sullivan watched the show.  (Doc. 30-20 at 1.)

Anderson became increasingly intoxicated during the evening.  (*Id.*)  At one point, Deerman and Sullivan confronted Anderson about her inebriation, as Anderson had driven the two to the bar.  (*Id.*; Doc. 34-2 at 3.)  Anderson told Deerman she would just walk home if she could not drive.  (Doc. 30-20 at 1.)

At some point that evening, Sullivan ended up with the keys to Anderson's car.  (*Id.*)  Todd does not remember ever having Anderson's keys that evening, (Doc. 32-1 at 12), but according to Sullivan, she gave the keys to Todd while Todd and Anderson were speaking beside his truck in the parking lot, (Doc. 34-2 at 3). Sullivan later told police she believed, though she was not certain, that Todd placed

the keys in Anderson's car.  (Doc. 1-1 at 19; Doc. 32-2 at 38; Doc. 34-3 at 6:04–56:11.)

Todd and Anderson spoke for several minutes in the parking lot of the bar, during which Todd repeatedly tried to convince Anderson to ride home with him, as he had not been drinking.  (Doc. 34-1 at 2; *see generally* Doc. 34-26.)  This conversation culminated in an exchange during which Anderson purportedly said that if Todd "didn't let her drive, she was going to walk home," to which Todd responded, "fine then, walk home."  (Doc. 30-14 at 1; Doc. 34-5 at 12:45–13:00.)  Todd claims that Anderson had made this threat several times before and he expected that she would nevertheless ride home with him once he was paid for the show.  (Doc. 34-5 at 12:50–13:10.)

Todd and Anderson parted ways in the parking lot.  Todd walked back to the bar, while Anderson began walking toward the road.  (Doc. 34-26 at 6:21.)  As shown by video footage from two security cameras, Anderson walked toward and then briefly along Highway 31.  One of the videos suggests that Anderson walked back and forth for several minutes while using her phone flashlight.  (*See* Doc. 34-26 at 6:42–8:17; *see generally* Doc. 34-6.)

Anderson was struck by a car, but the driver did not slow down or stop.  Anderson was found dead several minutes later.  (Doc. 30-11.)

**B. The Impact Scene and Investigation**

Hicks, an officer with the Clanton Police Department, was assigned to investigate Anderson's death.  (*See generally* Docs. 30-10, 32-2.)

Evidence gathered during the investigation showed that Anderson's blood alcohol content was 0.382 when she died.  (Doc. 30-15 at 1.)  Her cell phone and boots were found near where she was hit, but they were nevertheless scattered along the roadway and well away from her body.  (Doc. 32-2 at 13; Doc. 34-9 at 2.)  Her body had been carried on the vehicle's hood for approximately 100 feet before rolling off.  (Doc. 30-8 at 20.)

As to the keys to Anderson's car, the keys were found in a grassy area across the street from the bar three days later by Sergeant Cameron Bates and Corporal Tera Easterling.  (Doc. 30-8 at 9; Doc. 34-9 at 2.)  Hicks's field sketch shows that the keys were found close to the impact zone.  (Doc. 32-2 at 13–14; Doc. 34-9 at 2.)

After the accident, four individuals submitted unsolicited letters to the Clanton Police Department saying they had seen Todd the night of the accident and each gave conflicting accounts about where he placed his keys.  (*See* Doc. 34-23 at 2–7; Doc. 34-27 at 2; Doc. 34-29 at 2.)  Hicks never spoke with any of these individuals, and he claimed to not use their statements in any way.  (Doc. 32-2 at 36–38.)

### C. The Driver

The day after the accident, Roger Glenn—a frequent patron of the bar, someone who had been at the bar when Todd's band played, and a cousin of the chief of police of the Clanton Police Department—returned to the bar and told the bar's owner that he believed he struck a deer around midnight the evening before in front of the bar.  (Doc. 30-19 at 5–6, 9, 11, 21.)  The owner then called the police. (Doc. 34-16 at 3–4.)

Hicks arrived and examined Glenn's car.  (Doc. 34-14 at 2.)  While speaking with Hicks that afternoon, Glenn changed his story twice about where he hit the deer. (Doc. 30-8 at 18; Doc. 34-14 at 2.)  Glenn later admitted that he made up part of the story he shared with Hicks and the investigating officers.  (Doc. 34-11 at 8:25–8:38.) During testimony that he later gave, Hicks acknowledged that such behavior may suggest that a suspect is "trying to mislead, hide something deliberately."  (Doc. 32-2 at 31.)

Bates, who assisted Hicks in the investigation, learned of Glenn's involvement in the accident during the first week of the investigation and told Hicks that "they should do a search warrant on the car to see if [they] could obtain DNA from the vehicle."  (Doc. 30-8 at 12.)  Hicks, however, did not apply for a search warrant until almost two weeks later.  (Doc. 34-14 at 3.)  When he did obtain and

execute a search warrant on the car, Hicks was able to collect evidence containing Anderson's DNA.  (Doc. 30-16 at 6.)

Within several days of the accident, Glenn visited the Clanton Police Department, spoke with Chief Keith Maddox who was his cousin, and said that he might have "hit that lady."  (Doc. 30-19 at 18; Doc. 34-10 at 24.)  Maddox made no record of this conversation.  (Doc. 34-10 at 27–28.)  Following his conversation with Chief Maddox, Glenn had his car washed.  (Doc. 30-19 at 27.)

During his deposition, Chief Maddox acknowledged that he "probably passed that information about" his familial relationship with Glenn on to Hicks.  (Doc. 34-10 at 29.)

During an interview with Bates and Hicks approximately two weeks after the accident, Glenn disclosed his familial relationship with Chief Maddox and that he had already spoken with Chief Maddox about the accident.  (Doc. 34-11 at 17:55–18:15.)  Furthermore, Hicks told Bates at one point during the investigation that he believed Glenn knew he hit a person.  (Doc. 30-8 at 20.)

**D. The Final Investigation Report and Todd's Indictment**

Later that month and without assistance from anyone else, Hicks authored and issued a traffic homicide report, giving several statements of purported fact and recommendations.  Among others, Hicks wrote that Todd had intentionally and willfully thrown Anderson's keys across the road and allowed his intoxicated wife

8

to walk into traffic, leading to her death.  (Doc. 30-16 at 7.)  He further stated that Anderson's case should be presented to a grand jury to show that Glenn "should be cleared of accountability in this incident" and that Todd "should be held solely responsible and fully accountable for the wrongful death of Tonya Sherre Anderson."  (*Id.*)

In describing the pre-crash events, Hicks wrote that Anderson and Todd had a verbal argument in the parking lot of Friend's Bar, that Sullivan gave Todd the keys to Anderson's car, and that Anderson walked towards Highway 31 after their argument, with Todd watching her.  (*Id.* at 4.)  Hicks also asserted that Anderson was likely walking along Highway 31 and searching the roadway with a flashlight because her car keys had been thrown into the roadway.  (*Id.* at 6.)  As Hicks wrote, since Todd was the last known person to possess the car keys, "it is only logical that he would have to be the one who threw the key across the road, and did so intentionally."  (*Id.*)  He further wrote, "[a]ny reasonable person would conclude that if that is the only key to the car, then Tonya Anderson would go wherever the key was so that she could drive home."  (*Id.* at 7.)  He then asserted that Todd "willfully [threw] the key chain across a five lane highway and then allow[ed] his intoxicated wife to walk into traffic without any hesitation or afterthought."  (*Id.*)  He also wrote, "[t]here is no doubt or uncertainty that he deliberately and fully intentionally threw the key chain with the victim's car key across the roadway."  (*Id.*)

As to Glenn, Hicks wrote that Glenn did not realize he had hit anything and therefore he did not stop and continued home, that his own inspection of Glenn's vehicle on August 4 revealed no damage consistent with a pedestrian strike, and that the circumstances made it clear that Glenn did not see Anderson in the road or on his vehicle because Anderson was wearing dark clothing, it was dark outside, and Glenn was blind in his right eye. (*Id.* at 5–7.)

Hicks concluded his report by recommending that the circumstances of Anderson's death be presented to a grand jury for the purpose of showing why Glenn should be cleared of accountability for Anderson's death and for why Todd should be "held solely responsible and fully accountable for the wrongful death of Tonya Sherre Anderson." (*Id.* at 7.)

As Hicks recommended, the circumstances of Anderson's death were presented to a Chilton County grand jury. According to the assistant district attorney who presented the case, his office conducted no independent investigation into the case and instead relied on the findings of Hicks and the rest of the Clanton Police Department. (Doc. 30-10 at 1.) The grand jury returned an indictment charging Todd with manslaughter on February 1, 2019. (Doc. 30-2.) Todd was arrested because of the indictment. (Doc. 32-1 at 17.) Glenn was not charged with any crime.

### E. The Indictment Is Quashed

After the indictment, Todd filed a motion to quash with the Chilton County Circuit Court.  (Doc. 30-3.)  During the hearing, Hicks testified that Sullivan had told him that she was *pretty sure* Todd had placed Anderson's car keys in Anderson's car before Todd went back into the bar and that neither the video nor witness statements showed or confirmed that Todd had thrown Anderson's keys across Highway 31.  (Doc. 1-1 at 18, 24.)  As Hicks admitted, he "can't say one way or the other" whether Todd threw Anderson's keys based on the video.  (*Id.* at 35–36.)

Following this hearing, the Chilton County Circuit Court entered an order quashing the indictment against Todd.  (Doc. 30-5.)  The court found that, based on Hicks's testimony concerning the evidence presented to the grand jury, "no reasonable grand jury could have found probable cause to believe that *any crime* was committed in this case" and that even if probable cause could be found for a crime, the evidence presented "was completely devoid of evidence to support a finding of probable cause to believe that [Todd] committed the offense for which he was indicted."  (*Id.* at 1.)

### V.  DISCUSSION

In this action, Todd brings § 1983 and Alabama state law malicious prosecution claims against Hicks in his individual capacity, and Hicks moves for summary judgment on both.  In his motion, Hicks argues the following grounds for

summary judgment: (1) Hicks did not instigate Todd's criminal prosecution; (2) there is no evidence that Hicks knowingly falsified or fabricated any evidence presented to the district attorney or grand jury because Hicks had reason to believe that Todd had thrown Anderson's car keys across the roadway; (3) Hicks is entitled to qualified immunity because arguable probable cause existed; and (4) Hicks is entitled to state-agent immunity.  These arguments will be addressed in turn.

### A. Malicious Prosecution Claims

"To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; *and* (2) a violation of his Fourth Amendment right to be free from unreasonable seizures."[2]  *Grider v. City of Auburn*, 618 F.3d 1240, 1256

---

[2] The Eleventh Circuit recently simplified the standard for malicious prosecution as follows: "the plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).  As the Eleventh Circuit pointed out in setting forth this new standard, "significant overlap exists" between the elements of the common law tort of malicious prosecution and a Fourth Amendment violation involving a seizure pursuant to a legal process in that "[i]f a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause," which "will also satisfy the plaintiff's burden to establish causation." *Id.* at 1143–44 (citing *Williams v. Aguirre*, 965 F.3d 1147, 1162–65, 1167 (11th Cir. 2020)).

Courts in the Eleventh Circuit continue to cite to the common law standard for malicious prosecution claims under the Fourth Amendment.  *See, e.g.*, *Crider v. Williams*, No. 21-13797, 2022 WL 3867541, at *6 (11th Cir. Aug. 30, 2022) (per curiam) ("To establish [a Fourth Amendment malicious prosecution claim], [the plaintiffs] 'must prove "a violation of [their] Fourth Amendment right to be free of unreasonable seizures" and "the elements of the common law tort of malicious prosecution."'" (alteration in original) (quoting *Aguirre*, 965 F.3d at 1157)).  The Court in its discretion chooses to continue relying upon the traditional common law elements

(11th Cir. 2010).  The common law tort has five elements: (1) a judicial proceeding or prosecution instituted or continued by the defendant, (2) lack of probable cause, (3) malice, (4) termination of the proceeding in the plaintiff's favor, and (5) injury or damage.  *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 183 (Ala. 2016).  And to show a violation of his Fourth Amendment right to be free from unreasonable seizures, the plaintiff must establish "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process."  *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020).

A plaintiff can establish that the legal process is constitutionally infirm if he can show either (a) that the official should have known that the legal process failed to establish probable cause or (b) that the official "intentionally or recklessly made misstatements or omissions necessary to support" the legal process.  *Id.*  A plaintiff must identify affirmative evidence from which a jury could conclude that a false statement was made intentionally.  *Id.*

The parties do not contest that the criminal case was terminated in Todd's favor and that Todd suffered injury from the prosecution.

---

of malicious prosecution, as the distinction will not lead to a difference in the legal analysis or the outcome of the case.

### 1. Initiation of the Criminal Proceeding Against Todd

Hicks first argues that he is entitled to summary judgment because it was the district attorney's office, not Hicks, who initiated the criminal proceeding against Todd. However, Eleventh Circuit precedent establishes that causation for purposes of a malicious prosecution claim is not limited to the formal initiation of a criminal proceeding. On the one hand, law enforcement is not the legal cause of the criminal proceedings "where there was no evidence that they had anything to do with the decision to prosecute or that they had 'improperly influenced' that decision." *See Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 947 (11th Cir. 2008) (per curiam) (citing *Eubanks v. Gerwen*, 40 F.3d 1157, 1160–61 (11th Cir. 1994)). Yet, officers "improperly influence[]" the prosecutor's decision when they engage in "deception," which includes fabricating the evidence forming the basis of the prosecution against the plaintiff. *See id.* (citing *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989)); *see also Howe v. City of Enterprise*, 1:15-cv-113-JA-SRW, 2018 WL 8545947, at \*40 (M.D. Ala. Sept. 17, 2018) ("[I]f a defendant officer lies about the very fact that gives rise to the charge against a plaintiff, and is, indeed, the very source of that fact, then he or she instituted the proceedings for the purposes of a malicious prosecution claim." (emphasis omitted)).

Hicks has testified that he presented the contents of his report to the district attorney and grand jury and that his grand jury testimony was consistent with his

traffic homicide investigation report.  (Doc. 1-1 at 17.)  The district attorney has testified that his office conducted no independent investigation into the Anderson case and that his office relied on the findings made by Hicks, and the Clanton Police Department more broadly.  (Doc. 30-10.)  Todd argues that by authoring and submitting a report that wrongly accused Todd of throwing Anderson's keys, recommended presentment of the circumstances of Anderson's death to a grand jury, and recommended that Todd be held fully accountable and responsible criminally for Anderson's wrongful death, and in consideration of the district attorney's testimony that the case facts as presented to the grand jury came solely from Hicks and his investigation, Hicks influenced the criminal proceeding against Todd.  *See Ex parte Harris*, 216 So. 3d 1201, 1215 n.2 (Ala. 2016) ("Probable cause for a malicious-prosecution claim is not determined at the time of the arrest but when the defendant (usually the arresting officer) initiates the prosecution by filing a report with the prosecutor, submitting an affidavit, or giving grand-jury testimony."); *Wyatt v. Cole*, 504 U.S. 158, 164–65 (1992).  The Court agrees.

Hicks nevertheless argues that the grand jury indictment itself breaks the causal chain between his actions and Todd's criminal prosecution, regardless of Hicks's role in setting the wheels in motion or in drafting the report and making the accusations in it or in testifying before the grand jury about his report.  While the Eleventh Circuit has yet to directly resolve whether a subsequent indictment per se

absolves an investigating officer of liability for malicious prosecution, *see Aguirre*, 965 F.3d at 1168, the circuit has not foreclosed the notion that including materially false statements in an investigative report that later leads to an indictment may subject the acting officer to liability, *see Barts*, 865 F.2d at 1195–96 (concluding that intervening acts of a grand jury cannot shield an arresting officer from liability for false arrest where the intervening acts "were the result of deception or undue pressure" by the officer); *but cf. Jones v. Cannon*, 174 F.3d 1271, 1287 (11th Cir. 1999) (finding intervening acts of prosecutor and grand jury in returning an indictment broke the chain of causation from officer's false arrest when the officer is alleged to have perjured himself while testifying before the grand jury in light of precedents affording absolute immunity for grand jury testimony).   In fact, in *Aguirre*, the Eleventh Circuit drew attention to the Supreme Court's suggestion, albeit in dicta, that a plaintiff may maintain a claim under the Fourth Amendment for a seizure that follows an indictment if the grand jury proceeding is tainted by fabricated evidence or otherwise and therefore probable cause is lacking.   965 F.3d at 1168 (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017)).   The Court does not find persuasive Hicks's argument that a grand jury indictment per se negates causation.

Simply put, Todd has presented sufficient evidence, viewed in the light most favorable to him, to show that Hicks initiated, influenced, set the wheels of

government in motion, and otherwise played a significant role in the grand jury proceeding that led to Todd's criminal indictment.  Hicks has failed to show his entitlement to summary judgment on this basis.

### 2.  Misstatements, Omissions, Probable Cause, and Malice

Hicks next argues that he is entitled to summary judgment because probable cause existed to recommend criminally charging Todd with Anderson's death and that he made no misstatements or omissions that tainted the grand jury proceeding. This argument, while combined in Hicks's summary judgment brief, implicates two related issues—a material misstatement or omission and the separate but related issue of probable cause.

Probable cause "requires only 'a substantial chance' that evidence of criminal activity exists." *United States v. Babcock*, 924 F.3d 1180, 1192 (11th Cir. 2019) (citation omitted).   For probable cause to exist, a seizure must be "objectively reasonable under the totality of the circumstances." *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation omitted).  "[I]nstead of focusing on a single piece of evidence 'in isolation' and dismissing any evidence with 'an innocent explanation,' we must look at the 'totality of the circumstances.'" *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*,

138 S. Ct. 577, 589 (2018)).  Mere speculation is insufficient to establish probable cause.  *Whitaker v. Estelle*, 509 F.2d 194, 196 (5th Cir. 1975).[3]

Naturally, there is no probable cause when legal process is based on intentional or reckless misstatements or omissions by law enforcement necessary to support the process.  *See Aguirre*, 965 F.3d at 1165.  When a report or affidavit used to support a seizure contains alleged misstatements, the report must be read without the alleged misstatements to determine whether it otherwise supports a finding of probable cause.  *See Laskar v. Hurd*, 972 F.3d 1278, 1296 (11th Cir. 2020).

Hicks argues that he made no material misstatements or omissions in his report in stating that Todd had thrown Anderson's keys.  Contrary to Hicks's assertion, viewing the evidence in the light most favorable to Todd, genuine disputes of fact exist about the evidence particular to Anderson's keys and whether Todd made these misstatements and omissions "either intentionally or in reckless disregard for the truth."  *See Aguirre*, 965 F.3d at 1166 (citation omitted).  After all, Hicks wrote in his report that "[t]here is no doubt or uncertainty that [Todd] deliberately and fully intentionally threw the [key] across the roadway."  (Doc. 30-16 at 7.)  The facts Hicks presented to support his assertion that Todd threw Anderson's keys include an assertion that several witnesses had observed that Todd

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

had Anderson's keys at some point that evening; but none of them said that Todd threw any keys.  Furthermore, there was one witness (Sullivan) who said that she believed Todd had left the keys in Anderson's car.  Hicks acknowledged that he failed to include in his report Sullivan's statement that she believed Todd simply placed the keys inside the car.  (Doc. 1-1 at 18.)  And significantly, the video footage from that evening does not depict Todd or anyone else throwing Anderson's keys at all, let alone throwing them across the highway.  Moreover, Hicks later testified and admitted during the hearing on Todd's motion to quash and in his deposition that there was no direct evidence that Todd threw Anderson's keys.  Hicks further admitted that he could not say one way or another that Todd had thrown Anderson's keys, and he agreed that there was doubt as to how the keys ended up where they were later found by law enforcement.  Considering all of these evidentiary contradictions and omissions, a reasonable jury could conclude that Hicks made misstatements and omissions and that he did so, at a minimum, with reckless disregard for the truth.

The Court must now consider the report without the alleged misstatements or omissions to determine whether the report otherwise supports a finding of probable cause that Todd committed manslaughter.  *See Aguirre*, 965 F.3d at 1162 (holding that "the any-crime rule does not apply to claims of malicious prosecution under the Fourth Amendment").  While probable cause presents a low bar for law enforcement,

a factfinder must still be able to conclude that the totality of the circumstances reasonably suggests a substantial chance of criminal activity.  *See Washington*, 25 F.4th at 902.  The alleged misstatements and omissions in Hicks's report, which he echoed during his grand jury testimony, were necessary to establish probable cause that Todd committed manslaughter.  Because the report's statements about Todd throwing the keys were the only facts presented in support of probable cause for manslaughter, "probable cause evaporates" after deleting the statements.  *See Aguirre*, 965 F.3d at 1166–67.  And a report "does not support probable cause if it lacks any facts that suggest a crime occurred." *See id.* at 1167.  Accordingly, Hicks is not entitled to summary judgment on this basis.

Furthermore, since a reasonable jury could find that Hicks's report failed to assert probable cause due to his misstatements and omissions, a jury could accordingly find that Hicks acted with malice in producing this report. *See Williams v. City of Montgomery*, 839 F. App'x 356, 363–64 (11th Cir. 2020) (per curiam) ("Malice can 'be inferred from want of probable cause' and 'from circumstances surrounding and attending prosecution.'" (quoting *Ravenel v. Burnett*, 5 So. 3d 592, 600 (Ala. Civ. App. 2008))) .

Accordingly, the Court finds that, based on the foregoing analysis, a reasonable jury could conclude that Hicks violated Todd's Fourth Amendment rights and that Hicks committed the state and common law tort of malicious prosecution.

### B. Qualified Immunity

Hicks also asserts his entitlement to qualified immunity, claiming that there was arguable probable cause to arrest Todd.

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (citation omitted).  It is designed "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (citation omitted).

"An official asserting that he is entitled to the protection of qualified immunity must initially establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007).  Once the official makes this showing, the burden then shifts to the plaintiff to show that the official's conduct violated a constitutional right that was "clearly established" at that time. *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021); *Hardigree v. Lofton*, 992 F.3d 1216, 1223–24 (11th Cir. 2021).  When determining qualified immunity on a motion for summary judgment, "courts must construe the facts and draw all inferences in the

light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [the court must] credit the nonmoving party's version." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)).

As the parties do not dispute that Hicks acted within his discretionary authority, the Court will focus on whether Todd can demonstrate that his Fourth Amendment rights in this situation were clearly established. "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [police officer] that his conduct was unlawful in the situation he confronted." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation omitted). While a plaintiff need not demonstrate that there is case law specifically addressing his factual scenario, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[I]n the qualified immunity context, it is well established that arrests without probable cause violate the Fourth Amendment." *Grider*, 618 F.3d at 1258.

Todd has already shown that, when viewing the evidence in the light most favorable to Todd, Hicks did not have probable cause to recommend criminal charges against Todd. Hicks asserts though that even if Todd can show that Hicks lacked probable cause, Hicks still had *arguable* probable cause to recommend

charging him, entitling him to qualified immunity.[4]  "Arguable probable cause exists

where 'reasonable officers in the same circumstances and possessing the same

knowledge as the Defendants could have believed that probable cause existed to

arrest Plaintiff.'"  *Grider*, 618 F.3d at 1257 (citation omitted).  In contrast with

"actual" probable cause, arguable probable cause "gives ample room for mistaken

judgments . . . and reasonable error."  *See Gold v. City of Miami*, 121 F.3d 1442,

1446 (11th Cir. 1997) (per curiam) (citations omitted).[5]  Accordingly, the relevant

inquiry is "whether the [officer's] conduct violated clearly established law and not

whether [Todd's] conduct is a crime or ultimately will result in conviction."

*Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.8 (11th Cir. 2001) (per curiam).  If the

official had arguable probable cause to arrest or charge for *any* offense, qualified

---

[4] In light of *Aguirre*, this Court questions whether arguable probable cause to seize (or recommend charges) for any offense remains the appropriate framework for determining whether a defendant violated clearly established law in the context of a Fourth Amendment malicious prosecution claim.  First, the *Aguirre* court held that the any-crime rule does not apply to Fourth Amendment malicious prosecution claims.  965 F.3d at 1162.  Moreover, when the court discussed the "clearly established" prong of qualified immunity, it did not mention arguable probable cause and instead analyzed whether the plaintiff had a clearly established right to not be seized based on intentional and material misstatements in a warrant application.  *Id.* at 1168–69.  However, *Aguirre* was decided in 2020, which is after Hicks engaged in the conduct at issue here.  For this reason, and also because the parties briefed the issue of arguable probable cause, the Court will analyze whether Hicks had arguable probable cause to recommend that Todd be criminally prosecuted.

[5] Prior to the *Aguirre* decision suggesting a reevaluation of the use of the arguable probable cause standard in malicious prosecution claims, the Eleventh Circuit explained in *Grider* that courts are to apply "the same 'arguable probable cause' standard in the qualified immunity context for § 1983 claims for both false arrest and malicious prosecution, as both require a violation of the Fourth Amendment."  618 F.3d at 1257 n.25.

immunity will still protect the official.  *Grider*, 618 F.3d at 1257 (internal citation omitted).

The existence of arguable probable cause has not been shown here.  Hicks predicates his arguable probable cause argument largely on the same evidence as for his actual probable cause assertion; that is, his contention that Todd threw Anderson's keys into the roadway knowing that his intoxicated wife would have to enter the busy roadway to look for them.  No reasonable officer could have believed that Hicks had probable cause to recommend charges against Todd for manslaughter.  As already discussed, the factual basis for such probable cause—that Todd thew Anderson's keys into the roadway—was based on virtually nothing.  There was no video evidence or eyewitness testimony showing or even suggesting it.  And there has been no evidence presented showing that Todd committed any other criminal offense.  Nor can the Court ascertain probable cause to recommend charges against Todd for any other criminal offense if there was an insufficient basis to conclude Todd threw the keys.  Accordingly, if a reasonable officer had no basis to assert that Todd threw Anderson's keys into the roadway, then such officer would not have probable cause to recommend charges against Todd for *any* criminal offense in the context of Anderson's death at the hands of a hit-and-run driver.  *See Grider*, 618 F.3d at 1258 (upholding denial of qualified immunity when the evidence taken in the light most favorable to the plaintiff showed that there was no probable cause or

arguable probable cause for the challenged arrest); *Skop v. City of Atlanta*, 485 F.3d 1130, 1140–44 (11th Cir. 2007) (same).   Indeed, Hicks has not presented any argument or evidence of any other crime that Todd could have committed.   In short, Hicks has not shown that his actions were rooted in probable cause or arguable probable cause and therefore he has not shown his entitlement to summary judgment on the basis that Todd's criminal indictment lacked arguable probable cause.

Arguable probable cause is not the only problematic issue for Hicks under his assertion of qualified immunity.   Todd has also presented evidence that, if believed, shows that Hicks intentionally or recklessly made false statements in his report; that is, he made up the story about Todd throwing Anderson's keys across the roadway— and that such statements were necessary for Hicks's report to prove probable cause. Such a falsification certainly would amount to a violation of clearly established law. "[F]alsifying facts to establish probable cause is patently unconstitutional and has been so" since well before Todd's arrest.  *See Kingsland*, 382 F.3d 1220, 1232 (11th Cir. 2004), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715 (2019); *see also Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 2004) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights."); *Aguirre*, 965 F.3d at 1169–70 (holding that the plaintiff "had a clearly established right to be free from a seizure based on intentional and material misstatements in a warrant application" based on conduct that occurred in 2014).

Hicks continues to assert that he merely expressed unwarranted certainty in his homicide report, rather than outright falsification. The report's statements go much further than that. When viewing the evidence in the light most favorable to Todd, a reasonable jury could conclude Hicks intentionally or recklessly falsified information in his investigative report or alternatively intentionally or recklessly omitted other evidence.

Hicks asserts that the cases Todd cites in his qualified immunity argument are not sufficiently similar to this case to clearly establish the law governing this case. He asserts in his reply that *Kingsland* differs because it involved a woman who was pulled over and arrested for driving under the influence despite having no drugs in her system. (Doc. 37 at 10–11 (citing *Kingsland*, 382 F.3d at 1228).) He also asserts that *Riley* differs from this case because it involved police officers planting drugs in a suspect's car. (*Id.* at 11 (citing *Riley*, 104 F.3d at 1250).) But a plaintiff need not point to factually identical case law to show that a right is clearly established—rather, a plaintiff need only show that the statutory or constitutional issue is "beyond debate." *See Ashcroft*, 563 U.S. at 741. Todd has done so here.

Hicks has not shown his entitlement, at the present stage, to qualified immunity on Todd's Fourth Amendment malicious prosecution claim. Accordingly, he is not entitled to summary judgment on that basis.

### C. State-Agent Immunity

Hicks argues that he is entitled to state-agent immunity on the state law claim for malicious prosecution for many of the same reasons as he is entitled to qualified immunity.  As he states, "the same facts which establish an entitlement to qualified immunity may also establish that the officers are entitled to" state-agent immunity.  *Hunter v. Leeds*, 941 F.3d 1265, 1284 (11th Cir. 2019).

 "State-agent immunity shields government officials acting within their discretionary authority from liability unless federal or state laws 'enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise,'" or if the official "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Aguirre*, 965 F.3d at 1170 (alteration in original) (citation omitted).   Todd does not dispute that Hicks was acting within his discretionary authority, so he bears the burden of showing that an exception to state-agent immunity applies.

Hicks asserts that Todd is unable to show that Hicks acted "willfully, maliciously, fraudulently, or in bad faith," or that he committed "fraud, perjury, subordination or [] the willful suppression of known material facts."  (Doc. 31 at 21 (alteration in original) (quoting *Ala. Power Co. v. Neighbors*, 402 So. 2d 958, 965 (Ala. 1981)).)  Viewing the evidence in the light most favorable to Todd, a genuine dispute of material fact exists about whether Todd acted maliciously.   Under

Alabama law, "[m]alice can 'be inferred from want of probable cause' and 'from circumstances surrounding and attending prosecution.'" *Williams*, 839 F. App'x at 363–64 (quoting *Ravenel*, 5 So. 3d at 600).  Todd has presented evidence that, if believed, would show that Hicks lacked probable cause or arguable probable cause to recommend criminal charges against him, that Hicks put false information in his report and withheld or disregarded other information, and that Hicks did so with the intention and goal of protecting Glenn—a cousin of the chief of police—and implicating Todd.  Accordingly, Hicks has not shown his entitlement to state-agent immunity.  *See Aguirre*, 965 F.3d at 1170.

## VI.  CONCLUSION

Based on the foregoing, it is ORDERED that Defendant David P. Hicks, Jr.'s Motion for Summary Judgment (Doc. 30) is due to be and is hereby DENIED.

DONE, on this the 6th day of March, 2023.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE